Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 1164 | **DATE** | 2/25/2004 |
| **CASE TITLE** | USA vs. John Orozco | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to quash search warrant and suppress evidence [38-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 26 2004 | |
| | Notified counsel by telephone. | | date docketed | 47 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/25/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | No. 02 CR 1164 |
| ) | Judge Joan H. Lefkow |
| JOHN OROZCO, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, John Orozco ("Orozco") has been indicted by the United States of America ("United States") on a single charge of being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). Before the court is Orozco's motion to quash the search warrant executed at his residence and to suppress evidence directly and indirectly gained therefrom. For the reasons stated below, the motion is denied.

## BACKGROUND

The firearm that forms the basis of the charge leveled against Orozco was seized in a search of his residence that took place on December 5, 2002. In support of that search, on December 3, 2002, FBI Special Agent Ken A. Burress ("Agent Burress") filed an application and supporting affidavit with Magistrate Judge Arlander Keys for permission to search Orozco's home located at 1N367 Pouley Road in unincorporated Elburn, Illinois. Magistrate Judge Keys granted the application and issued the search warrant as requested. In his affidavit, Agent Buress stated the following:

1. That he had been employed as an FBI Special Agent for over four years and had received specialized training and had made numerous narcotics arrests. Agent Burress also

explained that he had previously served as a Special Agent with the Tennessee Bureau of Investigation, thereby giving him nearly ten years of experience investigating illegal possession, distribution and/or manufacture of controlled substances and street gangs. (Aff. ¶¶ 1-3.)

2. That based on his training and experience in drug and gang related investigations, persons involved in the street gang the "Latin Kings" are involved in the importation and distribution of controlled substances. Moreover, individuals associated with these types of street gangs keep detailed records/ledgers of their members, dues and transactions involving the amounts and types of drugs sold, the prices charged and monies received for those drugs and the names of the persons the drugs are to be distributed to. These documents and records were said to often be kept in the residences of higher ranking gang members, specifically the "Caciqua," or number two person in charge of the gang. Agent Burress also explained that he was involved in an ongoing investigation into the Latin Kings street gang in Aurora, Illinois called "Round Two." (Aff. ¶¶ 5-10.)

3. That according to Juan Francisco Corral, an admitted member of the Latin Kings who has been indicted and is cooperating with federal investigators, Andres Ramirez A/K/A "Oso" or "Inca" is the leader of the Aurora Latin Kings street gang while Orozco, A/K/A "Big Turtle" served as the Caciqua or second in command. Corral also stated in later interviews that Jorge Alanis, A/K/A "Sharkey" is a close associate of Orozco's and that Alanis received large amounts of cocaine from Orozco. Corral further explained that he purchased 11 kilograms of cocaine from Orozco on or about June 24, 2002 and that he knew Orozco as "Big Turtle" since 1989. Corral explained that Orozco owns a large ranch near Durango, Mexico as well as other businesses such as bars and strip clubs in that area. He is alleged to receive marijuana and

2

cocaine shipments in semi-tractor trailer truck loads and sends the money back to Mexico in the same trucks. (Aff. ¶¶ 13, 16-17.)

4. That a search warrant was executed on October 22, 2002 at the residence of Ramirez, who was identified by several individuals as the number one officer of the local Latin Kings street gang. The search of Ramirez's residence uncovered a list of gang members, and included on that list was the name "Big Turtle." (Aff. ¶ 14.)

5. That according to Jose X. Hernandez, another admitted member of the Latin Kings who has been indicted and is cooperating with federal authorities, Orozco was the second in command or "Caciqua" of the local Latin Kings street gang. Hernandez informed law enforcement officers of his belief that Orozco sold approximately 100 kilograms of cocaine over a period of time. Hernandez further stated that Orozco also sells marijuana in amounts approaching 100 pounds at a time. Finally, Hernandez confirmed that Orozco is known amongst the Latin Kings as "Big Turtle." (Aff. ¶ 15.)

6. That according to Jose Oliva, who has been indicted and is cooperating with federal authorities, he received cocaine at various times from Orozco during the first six months of 2002. Oliva also stated that "Big Turtle" holds the rank of "Caciqua" or second in command of the Aurora Latin Kings. (Aff. ¶ 18.)

The above evidence was submitted by Agent Burress in support of an application to search a one story, white ranch-style house with an attached two car garage. The house was marked 1N367 and located on Pouley road in Elburn, Illinois. Public records indicated that the house was owned by Corina Torres, who Burress claims was married to Orozco. The United States Postal Service in Elburn, Illinois further stated that persons receiving mail at the house

3

were "Torres/Orozco." Burress stated in his affidavit that based on his investigation he had discovered that this was Orozco's residence and, because Orozco was the Caciqua of the Aurora Latin Kings, a search of the house would uncover "ledgers of drug trafficking activity and documents pertaining to gang activities, such as membership lists, photographs of gang members, identified gang clothing, [and] receipts of drug trafficking." (Aff. ¶ 22.)

## DISCUSSION

Orozco submits that the search warrant obtained relating to his residence should be quashed and that any evidence seized from the search should be suppressed because the affidavit supplied by Burress did not provide a nexus between any alleged illegal activity or alleged contraband items and the residence. According to Orozco, because no nexus exists, the affidavit fails to establish probable cause to support the search and runs afoul of the Fourth Amendment to the United States Constitution. U.S. Const. Amend. IV ("no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

In determining whether a search warrant should be issued,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for . . . conclud[ing] that probable cause existed.

*United States v. Lamon*, 930 F.2d 1183, 1187 (7th Cir. 1991) (ellipsis and bracket in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). The affidavit must bring forth "specific facts and circumstances to allow the judge to reasonably conclude that the items sought to be

seized are associated with the crime and located in the place indicated." *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002). However, "[i]f evidence is obtained pursuant to a search warrant unsupported by probable cause, it is nevertheless only suppressed where the magistrate abandoned his detached and neutral role, or where the officers seeking the warrant were dishonest or reckless in preparing the affidavit in support of the warrant, or where the officers could not have reasonably had an objectively reasonable belief in the existence of probable cause." *United States v. Dumes*, 313 F.3d 372, 380-81 (7th Cir. 2002) (citing *United States v. Leon*, 468 U.S. 897 (1984)).

Orozco's argument that the warrant at issue here was not supported by probable cause is persuasive. The United States itself concedes that the only correlation between any illegal activity or contraband items and Orozco's residence was Agent Burress' experience in knowing that high ranking gang members, particularly those who serve as the "Caciqua," oftentimes keep records of gang activities in their residences. There is, however, no particular factual basis to support that Orozco kept any such records in his home. In *United States v. Lamon*, 930 F.3d 1183 (7th Cir. 1991), the court noted that "issuing magistrates are 'entitled to take into account' the experience of officers whose affidavits explain the significance of specific types of information," but also clarified that "conclusory statements without more do not provide a substantial basis for finding probable cause." *Id.* at 1189.

The court in *Lamon* dealt with three searches, one dealing with an alleged drug dealer's secondary residence, one with his automobile and one concerning his primary residence. 930 F.2d at 1189-90. There was ample basis in the affidavit supporting the search of the secondary residence, as one informant stated that the defendant had dealt drugs out of this

5

secondary residence, that the defendant still had drugs remaining there after the sale and that the defendant also sold drugs from the automobile which was then parked in front of the residence. *Id.* at 1188. These activities taken together "suggested a pattern of criminal activity" and supported a search of the secondary residence. *Id.* With respect to the automobile, the affidavit filed in support of the search warrant did not indicate when drugs where sold out of the car. *Id.* at 1188-89. Significantly, the court also noted that the detective's statement that "drug dealers often store drugs and drug paraphernalia in their automobiles" was, by itself, insufficient to establish probable cause because it was nothing more than a statement of a conclusion. *Id.* at 1189. The court noted, however, that these two factors, combined with the informant's discussion of recent drug sales out of the secondary residence where the automobile was parked, established "a patten of drug trafficking that involved both the house and the automobile" and did manage to establish probable cause. *Id.* Finally, with regard to the search of the primary residence, the court noted that "the specific evidence already seized–along with [the detective's] experience that drug dealers often hide money, drugs, and other incriminating evidence at their permanent residences–provided a substantial basis for a finding of probable cause." *Id.* at 1190.

There is little in the affidavit provided here to support the notion that Orozco's residence was involved in drug transactions. While the affidavit provides evidence that Orozco himself may have been a drug dealer, his residence was never implicated. Some of the alleged drug transactions were alleged to have been performed through "coded phone contacts" and "face-to-face meetings near [an informant's] residence." (Aff. ¶ 18.) As for others transactions described by various informants, no location at all was identified. (Aff. ¶ 15, 17.) Thus, the court is left only with statements that Orozco was the "Caciqua" and that, in Agent Burress' experience, gang

6

records or ledgers are kept in the residences of such individuals. This is nothing more than the conclusional statements the court rejected in *Lamon* and is insufficient to establish probable cause.

The United States argues that other cases have found probable cause in situations similar to this case. For example, it points to *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars in United States Currency*, 965 F.2d 868 (10th Cir. 1992), where in response to an argument similar to that which Orozco makes here the court noted,

> In accordance with our prior rulings, we conclude that a sufficient nexus was established between the evidence sought, i.e., evidence of claimant Fisher's involvement with drug trafficking, and his residence. The circumstances described in the affidavit, indicate that claimant Fisher was a large drug dealer who had been dealing drugs over the years. This information combined with the opinion of Officer Fugate, an officer experienced in drug investigations, that drug dealers frequently keep records or notations of their transactions where they have ready access, provides a sufficient nexus for a reasonable person to conclude that drug records would be maintained at the claimant's home which was also his alleged place of business.

*Id.* at 874. Moreover, the United States directs the court's attention to *United States v. Sandoz*, 784 F. Supp. 777 (D. Or. 1992). In that case a sufficient basis to search a defendant's residence was found where the evidence showed that the defendant was a distributor of cocaine and that based on a police officer's experience "evidence of the distribution of controlled substances will be found in the residences and vehicles of a distributor of cocaine . . . ." *Id.* at 781.

One has a hard time reconciling the findings of probable cause in these cases with the Seventh Circuit's rejection in *Lamon* of conclusional statements concerning only an officer's

7

experience. Neither *United States Currency* nor *Sandoz* is binding precedent and to the extent there is a conflict with *Lamon*, this court is obligated to follow *Lamon*.

Of course, a conclusion that evidence was obtained pursuant to a search warrant unsupported by probable cause does not end the analysis here, as suppression of evidence based on a warrant later determined to be defective is only necessary in certain limited circumstances. In *Leon,* the Court noted that the purpose of the exclusionary rule was to deter police misconduct, and excluding evidence obtained in good-faith reliance on a probable cause determination made by a neutral and detached magistrate would in no way serve that purpose. 468 U.S. at 916-22. The court did list, however, four situations where the exclusionary rule would still warrant suppression of evidence gained from a warrant unsupported by probable cause. These include (1) when "a magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit"; (2) when a magistrate has failed to perform her neutral or detached judicial role; (3) when the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) when the warrant is facially deficient in that it does not identify the place to be searched or things to be seized with particularity. *Id.* at 923. *See also, United States* v. *Medlin*, 798 F.2d 407, 409 (10th Cir. 1986); *United States* v. *Gant*, 759 F.2d 484, 487 (5th Cir. 1985).

There is no basis in the record to support (1), (2) or (4) above and, in any event, Orozco zeroes in on (3). He argues that the agents involved in this case could not have held an objectively reasonable belief that probable cause existed. As the Seventh Circuit has noted, this is a "difficult standard" and requires proof that "a reasonable officer would have known that the warrant did not support probable cause." *United States* v. *Fairchild*, 940 F.2d 261, 264 (7th Cir.

1991); *see also, Leon,* 468 U.S. at 922 n. 23 (whether "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization"); *Koerth,* 312 F.3d at 866 ("Could the officer have reasonably believed that the facts set forth in the affidavit were sufficient to support a magistrate's finding of probable cause."). "[I]n the ordinary case, a law enforcement officer 'cannot be expected to question' the magistrate's probable cause determination." *United States* v. *Sleet,* 54 F.3d 303, 307 (7th Cir. 1995) (quoting *Illinois* v. *Krull,* 480 U.S. 340, 349 (1987)).

There was a reasonable basis here for an officer to believe that probable cause existed. The affidavit was filed during the midst of an ongoing investigation into a particular street gang, and numerous members of the gang stated that Orozco was the "Caciqua" or second in command. Through his experience, the affiant was aware that gangs such as the Latin Kings keep detailed records and ledgers of their activities and that these records or ledgers are normally kept at the home of the "Caciqua." Moreover, through his investigation Burress learned that Orozco resided at the residence which was to be searched. Finally, Burress had substantial evidence that Orozco was involved in ongoing criminal activities, as a number of the other gang members described drug transactions involving Orozco, even if those transactions presented no nexus to Orozco's residence. Based on all these facts, there was a reasonable basis for Burress to believe that probable cause existed and his reliance on the probable cause determination made by a detached and neutral magistrate mandates that Orozco's motion be denied.

## CONCLUSION

For the reasons stated above, Orozco's motion to quash search warrant and suppress evidence is denied [#32].

ENTER: /s/ Joan H. Lefkow
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: February 25, 2004